1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    JUAN JOSE MURILLO,                          Case No.  15-cv-01325-JSC

8                Plaintiff,

9         v.                                     **ORDER RE: PARTIES' CROSS
                                                 MOTIONS FOR SUMMARY
10   CAROLYN W. COLVIN,                          JUDGMENT**

11               Defendant.

12

13        Plaintiff Juan Jose Murillo ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g),

14   seeking judicial review of a final decision by Defendant Carolyn W. Colvin, the Commissioner of

15   the Social Security Administration ("Defendant" or "Commissioner"), denying his application for

16   disability benefits and Supplemental Social Security income under Titles II and XVI of the Social

17   Security Act, 42 U.S.C. §§ 1381, 1383(f).  Both parties have consented to the jurisdiction of the

18   undersigned magistrate judge.  (Dkt. Nos. 8, 10.)  Now pending before the Court is Plaintiff's

19   motion for summary judgment and Defendant's cross-motion for summary judgment.  (Dkt. Nos.

20   20, 25.)  After carefully considering the parties' submissions, the Court GRANTS Plaintiff's

21   motion in part, DENIES Defendant's cross-motion, and REMANDS for a new hearing consistent

22   with this Order.

23                                  **LEGAL STANDARD**

24        A claimant is considered "disabled" under the Social Security Act if he meets two

25   requirements.  *See* 42 U.S.C. § 423(d); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

26   First, the claimant must demonstrate "an inability to engage in any substantial gainful activity by

27   reason of any medically determinable physical or mental impairment which can be expected to

28   result in death or which has lasted or can be expected to last for a continuous period of not less

United States District Court
Northern District of California

than 12 months." 42 U.S.C. § 423(d)(1)(A).  Second, the impairment or impairments must be severe enough that he is unable to do his previous work and cannot, based on his age, education, and work experience "engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).  To determine whether a claimant is disabled, an administrative law judge ("ALJ") is required to employ a five-step sequential analysis, examining:

> (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe medically determinable physical or mental impairment" or combination of impairments that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the claimant's "residual functional capacity," the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work."

*Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012); *see also* 20 C.F.R. §§ 404.1520(a), 416.920(a).

## PROCEDURAL HISTORY

Plaintiff applied for Supplemental Security Income and Social Security Disability Insurance in February 2011.[1]  (Administrative Record ("AR") 70, 71, 230.)  He alleged disability beginning October 17, 2007 due to hip injuries.  (AR 71, 88).  There is also reference throughout the record, though not in Plaintiff's initial application, to disability due to depression.  The Social Security Administration ("SSA") denied his claims initially on August 17, 2011 and again on reconsideration on February 23, 2012.  (AR 78, 88.)  Plaintiff then filed a request for a hearing in front of an ALJ.  (AR 91.)

On September 24, 2013,[2] Plaintiff, and his non-attorney representative, Dan McCaskell, appeared at the hearing.  (AR 40.)  Mark J. Kelman, a vocational expert ("VE"), appeared telephonically and testified at the hearing.  (AR 40, 42).  Plaintiff testified with the assistance of a Spanish interpreter.  (*Id.*)  The ALJ issued a written decision denying Plaintiff's application and

---

[1] Parts of the record indicate that Plaintiff initially filed for benefits on February 7, 2011, while others list the date as February 14, 2011.  (*Compare* AR 70, *with* AR 230.)

[2] The hearing was initially scheduled for January 28, 2013, but was postponed several times at Plaintiff's request, first to give him the opportunity to obtain representation in the matter and later because his representative was unavailable.  (AR 128, 159.)

United States District Court
Northern District of California

finding that he was not disabled within the meaning of the Social Security Act and its regulations. (AR 21-34.)  Plaintiff filed a request for review (AR 14), which the Appeals Council denied on January 27, 2015.  (AR 1.)  On March 21, 2015, Plaintiff initiated the current action, seeking judicial review of the SSA's disability determination pursuant to 42 U.S.C. § 405(g).  (Dkt. No. 1.)

## FACTUAL BACKGROUND

Plaintiff, who was 36 years old when he filed for disability, was a resident of Santa Rosa and father of two children at the time of his initial application.  (AR 223, 231, 237, 266.)  He attended school through the 6th grade and speaks only Spanish.  (AR 266-267.)  In the years preceding his alleged disability onset date, Plaintiff first worked for six years as a manual field laborer then for a decade as a construction worker and landscaper.  (AR 268.)  He stopped working on October 17, 2007 because of his conditions, although there is some reference in the record to Plaintiff having returned to work for at least some time as of December of 2012.  (AR 267, 268; *see also* AR 722 (Plaintiff reported to his physician that he had a job that did "not require[ ] a lot of physical activity").)

In his initial application, Plaintiff alleged that he has been disabled due to his physical condition—namely, knee and hip injuries—since October 17, 2007.  (AR 71, 254.)  Plaintiff began suffering from pain in his knee when he was 29 years old, which worsened, spread to his hip and lumbar spine, and has continued since.  (AR 339, 356.)  Since then, he has suffered from severe degenerative changes in both hips, which was diagnosed as osteoporosis and osteoarthrosis.  (AR 70, 433.)  In 2009, Plaintiff had surgery to replace his right hip and, as of the time of his application, awaited a second total hip replacement on the left side.  (AR 290, 439.)  Plaintiff has suffered from depression since 2003, at least in part due to feelings of shame for being so physically challenged at a young age.  (AR 54, 290.)

## I. Medical Evidence

### A.  Medical History

After reporting knee and hip pain for two years, Plaintiff had right hip surgery in 2009. (AR 417.)  As a result of Plaintiff's medical condition, he has seen a variety of physicians and specialists to help diagnose and cope with his symptoms.  A discussion of the relevant medical

United States District Court
Northern District of California

evidence follows.

### 1. Initial Injury and Treatment from 2007 to 2009

The earliest records in the Administrative Record date back to 2007 when Plaintiff visited Kaiser Permanente Hospital ("Kaiser") in Santa Rosa, California due to pain radiating from his lower back down into his leg. (AR 338.) Medical staff concluded that the pain stemmed from a hip injury. (AR 339-340.) Records reflect that Plaintiff reported several causes of his initial injury: in 2007 he reported that the injury occurred in 2003 when Plaintiff was "working out and running with a very high stride" and felt knee pain (AR 339); he reported sustaining the initial hip injury in 2004 while playing competitive soccer (AR 315); and he also reported that his hips gradually began hurting in 2003 after he began working as a landscape laborer (AR 832). Whatever the exact cause, by October 2007, Plaintiff had been engaging in physical therapy due to complaints of pain, and his physical therapists and primary care physician Dr. Gregory Mark Nunez agreed that Plaintiff's hip was the root cause of that pain. (AR 338-340, 356.) Dr. Nunez diagnosed Plaintiff with severe osteoarthritis of the hip and aseptic necrosis[3] of the bone, and referred Plaintiff to an orthopedist to evaluate the need for hip surgery. (AR 338-340, 356.) In early January 2008, Plaintiff again contacted Dr. Nunez at Kaiser to discuss his pain. (AR 343.) Dr. Nunez noted the severity of Plaintiff's condition and extended Plaintiff's disability coverage. (*Id*.) Plaintiff's medications during this period included acetaminophen[4] and Methocarbamol.[5] (AR 336-337.)

---

[3] Aseptic necrosis is also known as avascular necrosis. *Aseptic Necrosis (Avascular Necrosis or Osteonecrosis)*, MedicineNet.com, http://www.medicinenet.com/aseptic_necrosis/article.htm (last visited Jan. 21, 2016.) "Avascular necrosis is the death of bone tissue due to a lack of blood supply. Also called osteonecrosis, avascular necrosis can lead to tiny breaks in the bone and the bone's eventual collapse." *Avascular Necrosis*, MayoClinic, http://www.mayoclinic.org/diseases-conditions/avascular-necrosis/basics/definition/con-20025517 (last visited Jan. 19, 2016).

[4] Acetaminophen is a pain reliever and fever reducer commonly used to treat arthritis and backaches. *Acetaminophen*, DRUGS.com, http://www.drugs.com/ acetaminophen.html (last visited Jan. 14, 2016).

[5] Methocarbamol is a muscle relaxant used to treat skeletal muscle conditions in conjunction with rest and physical therapy. *Methocarbamol*, DRUGS.com, http://www.drugs.com/ methocarbamol.html (last visited Jan. 14, 2016).

United States District Court
Northern District of California

United States District Court
Northern District of California

1      There are few treatment records from the six months that followed, likely because Plaintiff

2  lost insurance coverage.  (AR 345, 359.)  However, while uninsured, in early June 2008 Plaintiff

3  arrived at the emergency room complaining of right hip pain, depression, lack of appetite, and

4  suicidal thoughts.  (AR 319-321.)  X-rays of Plaintiff's hips taken during that visit reflected a

5  "severe deformity" and reaffirmed the diagnosis of right hip degenerative changes and severe

6  avascular necrosis.  (AR 335.)  The treating physician indicated that Plaintiff suffered from

7  alcohol abuse, and depression.  (AR 321.)  On that visit, Plaintiff also underwent a suicide risk

8  assessment, which concluded that Plaintiff suffered from major depressive disorder and used

9  alcohol consumption as a means of coping with his hip pain.  (AR 325-326.)  The record quotes

10  Plaintiff as saying, "I worry too much. I think too much" and requesting anti-depressants.  (AR

11  326-329.)  Upon discharge, Plaintiff obtained prescriptions for Prozac,[6] Vicodin,[7] and Librium,[8]

12  Fluoxetine,[9] and Prozac.  (AR 321, 349, 363, 364, 365.)

13      Plaintiff returned to Dr. Nunez later in June once he obtained Medi-Cal coverage.  (AR

14  359.)  Dr. Nunez observed that Plaintiff had a pronounced limp on the right side, and decreased

15  flexion and rotation ability on his right hip.  (AR 360.)  He concluded that Plaintiff's hip was

16  worsening and that he would eventually need a hip replacement.  (AR 359.)  The same month

17  Plaintiff saw Dr. Andrew R. Goldstein, an orthopedist, who noted that Plaintiff suffered from

18  severe avascular necrosis in both hips and that all non-operative measures had failed.  (AR 361,

19  362.)  Nevertheless, Dr. Goldstein recommended that Plaintiff try to wait until he reached the

20  "clinically needed given age" recommended for hip surgery[10] despite his persistent pain given his

---

[6] Prozac is a selective serotonin reuptake inhibitors (SSRI) antidepressant.  *Prozac*, DRUGS.com, http://www.drugs.com / prozac.html (last visited Jan. 14, 2016).

[7] Vicodin (acetaminophen and hydrocodone) is a narcotic pain reliever for moderate to severe pain.  *Vicodin*, DRUGS.com, http://www.drugs.com/vicodin.html (last visited Jan. 14, 2016).

[8] Librium is a benzodiazepine which results in a reduction in anxiety and muscle spasm.  *Librium*, DRUGS.com, http://www.drugs.com/cdi/librium.html (last visited Jan. 14, 2016).

[9] Fluoxetine is a selective serotonin reuptake inhibitors (SSRI) antidepressant.  *Fluoxetine*, DRUGS.com, http://www.drugs.com/ fluoxetine.html (last visited Jan. 15, 2016).

[10] The record does not reflect what the clinically necessary age recommended for hip surgery is. (*See* AR 348.)

1   young age and the likely need for revision surgery.  (AR 348, 359, 362.)

2           In July, Dr. Nunez noted that Plaintiff's hip had "improved on medication" but advised

3   that it was important that Plaintiff not return to construction work and regularly take medication;

4   his notes also indicate that Plaintiff reported a plan to attend school and retrain so he could get a

5   job that did not require heavy work.  (AR 346, 348, 359, 365.)  The same month, Plaintiff

6   similarly reported to Dr. Goldstein that his "hip [was] not doing too badly" due to his pain

7   medications, and Dr. Goldstein again recommended putting off hip surgery as long as possible due

8   to Plaintiff's young age.  (AR 365.)

9           Through the end of 2008, Plaintiff visited Dr. Nunez for follow-up appointments and

10  reported increasing pain levels: in September, he reported that his hip had improved on the pain

11  medication; in October he experienced a pain flare-up; and by December Plaintiff's pain was not

12  getting better, it hurt to walk, and he wanted surgery.  (AR 366, 370, 374.)  During this period,

13  Plaintiff's pain medications included Hydrocodone-Acetaminophen/Vicodin[11] and Ibuprofen.

14  (AR 336, 349, 363, 365, 373.)

15                    *2. Hip Replacement Surgery and Immediate Recovery*

16          Plaintiff had right total hip replacement surgery in March 2009.  (AR 416-417, 439-440.)

17  Dr. Goldstein performed the surgery.  (AR 384.)  During the pre-operation physical exam, the

18  physician's assistant noted Plaintiff's limited range of motion.  (*Id*.)  Upon discharge, Plaintiff was

19  prescribed Coumadin[12] and Vicodin.  (AR 418.)  Radiology reports following the surgery state the

20  total hip prosthesis was "intact and normally aligned."  (AR 430.)  After the procedure, Plaintiff

21  reported that he was doing well and experiencing "no real pain," and Dr. Goldstein observed that

22

23  _____

24  [11] Hydrocodone-acetaminophen is a combination of drugs used to relieve moderate to severe pain.
    *Acetaminophen and Hydrocodone*, DRUGS.com,

25  http://www.drugs.com/acetaminophen_hydrocodone.html (last visited Jan. 15, 2016).  Vicodin is a
    brand name for hydrocodone-acetominophen.  For the purposes of this Order, the Court refers to

26  hydrocodone-acetaminophen by its brand name, Vicodin, which Plaintiff's physicians repeatedly
    prescribed.

27  [12] Coumadin is a blood thinner used to prevent heart attacks, stroke, and blood clots. *Coumadin*,
    DRUGS.com, http://www.drugs.com/ coumadin.html (last visited Jan. 15, 2016).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Plaintiff had "[g]ood, painless" range of motion on his right hip.  (AR 392, 397.)

However, in the late summer and fall of 2009 Plaintiff began to experience pain in his left hip that increased in intensity when he walked or moved.  (AR 400, 403.)  Indeed, x-rays from October reflect "severe degenerative changes in the left hip[,]" suspicions of avascular necrosis, and slightly worse joint narrowing and osteophytes[13] on the left side.  (AR 431, 432, 543.) Although Plaintiff's treating physician, Dr. Pastran, observed that Plaintiff's pain increased when he moved his left hip, he perceived no deformity or swelling of the hips.  (AR 401.)  And by November 2009 Plaintiff reported that his left hip had improved.  (AR 403.)  Dr. Pastran discussed with Plaintiff the possibility of a future left total hip replacement, but noted that he should attempt to avoid surgery through "medication and possible work restrictions."  (AR 404.)  By the next month Plaintiff reported that his pain following surgery had subsided to almost normal levels. (AR 403, 553.)  Plaintiff also reported being active.  (AR 537.)

### 3. Continued Hip Pain and Depression from 2010-2013

Unfortunately, Plaintiff's left-side hip pain continued; in January 2010, he returned to Dr. Pastran reporting ongoing hip pain despite taking Ipubrofen and Vicodin.  (AR 406.)  Dr. Pastran advised Plaintiff that if his symptoms did not improve with conservative treatment, like medication and work restrictions, he may need a total left hip replacement.  (AR 407.)  From February to May 2010, Plaintiff returned to the doctor several times for refills of Vicodin (AR 559, 561, 563), and he also had a prescription for Relafen[14] (AR 407).  Records from May 2010 confirm severe generative changes in Plaintiff's left hip and Plaintiff's reports of pain.  (AR 478.) However, by December 2010, although Plaintiff continued to complain of "chronic hip pain," Dr. Goldstein noted that he was not yet a candidate for total left hip replacement surgery.  (AR 563; *see also* AR 570 ("Only mild symptoms left hip posteriorly.  Certainly not enough symptoms to

---

[13] Osteophytes are bone spurs (small projections of bone) that "can make it painful to move your hip" and "can reduce the range of motion in your hip joint."  *Bone Spurs*, MayoClinic, http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/symptoms/con-20024478 (last visited Jan. 19, 2016).

[14] Relafen is a non-steroidal anti-inflammatory drug used to relieve the symptoms of osteoarthritis. *Relafen,* DRUGS.com, http://www.drugs.com/relafen.html (last visited Feb. 24, 2016).

offer hip surgery despite the [avascular necrosis].").)  Dr. Goldstein considered administering a cortisol injection into Plaintiff's left hip to ease the pain (AR 409, 412), but there is no indication in the record that Plaintiff ever received the shot.

Instead, throughout 2011 Plaintiff continued to complain of hip pain.  (AR 595-596.) During a meeting with a health educator to whom Plaintiff was referred for high cholesterol, Plaintiff reported that he was unable "to do much exercise given [the] situation with his hips[.]" (AR 601.)  Doctors observed "severe degenerative change in the left hip with extensive subchondral cysts in the left femoral head and [a] collapse of the femoral head suspicious for avascular necrosis."  (AR 478.)  In June 2011, Dr. Pastran noted that Plaintiff's left hip continued to generally deteriorate and that, although no longer showing signs of depression, Plaintiff suffered from alcohol dependence due to his chronic medical condition, and recommended that Plaintiff follow-up with an orthopedist.  (AR 482, 649.)

Through the end of 2011 and January 2012, Plaintiff reported experiencing pain when he walked or rode his bike and that his hip pain was getting worse, and repeatedly requested pain medication refills.  (AR 659 660, 667, 782.)  Dr. Pastran diagnosed osteoarthritis of the hip, prepatellar bursitis,[15] abnormal liver functioning, and depression due to his chronic pain.  (AR 695-697.)  Dr. Pastran noted that Plaintiff's use of the clutch while driving likely caused his new left knee pain.  (AR 696.)  From 2011 to 2012, Plaintiff's pain medications included ibuprofen, and Vicodin, and Nabumetone,[16] and he continued to take Prozac for depression.  (AR 479, 595-596, 662, 667, 699.)

On December 7, 2012, Plaintiff returned to his new primary care physician, Dr. Carlos Garcia, reporting hip and foot pain.  (AR 709, 712-713.)  Plaintiff reported worsening left hip pain, and Dr. Garcia posited that the pain was "maybe causing mechanical changes."  (AR 713.)

---

[15] Prepatellar bursitis is an inflammation in front of the kneecap.  *Prepatellar (Kneecap) Bursitis*, OrthoInfo, http://orthoinfo.aaos.org/topic.cfm?topic=a00338 (last visited Jan. 20, 2016).

[16] Nabumetone is a nonsteroidal anti-inflammatory drug used to treat rheumatoid arthritis and osteoarthritis.  *Nabumetone*, DRUGS.com, http://www.drugs.com/cdi/nabumetone.html (last visited Jan. 15, 2016).

United States District Court
Northern District of California

1   Dr. Garcia observed that Plaintiff had limited range of motion on his left hip and soreness during

2   both abduction and rotation, and concluded that Plaintiff's hip injury had worsened since March

3   2009.  (AR 713-714.)  However, later that month, Plaintiff visited Dr. Goldstein reporting "some

4   pain [in the] left hip area, but [it was] not bad" and increasing pain in his left lower back.  (AR

5   722, 815.)  Plaintiff reportedly told Dr. Goldstein that he did not believe he needed surgery on the

6   left hip and that he had a job that did "not requir[e] a lot of physical activity."  (*Id.*)  On the other

7   hand, the same record indicates that Plaintiff wanted to re-explore the hip surgery option.  (AR

8   721.)  Dr. Goldstein observed that Plaintiff experienced pain with bending forward or twisting at

9   his waist, and prescribed Plaintiff a pain reliever and heat.  (AR 722, 816.)

10          Plaintiff returned to the doctor in May 2013 reporting continued and increased pain in his

11  left hip.  (AR 820.)  The treating physician observed, similar to the Plaintiff's prior visit, "severe

12  osteoarthritis of the left hip with partial collapse of the bony matrix and sclerosis, suggestive of

13  avascular necrosis" and an issue involving a vertebrae in his lumbar spine.  (AR 820.)  Plaintiff

14  was referred to Dr. Goldstein to discuss the results of his most recent left hip x-ray and treatment

15  options.  (AR 826.)

16              4.      *Non-Hip-Related Treatment in 2011 and 2012*

17          Throughout 2011, Plaintiff also received medical care unrelated to his hip pain.  In January

18  Plaintiff arrived in the emergency room with a cut on his finger.  (AR 582.)  According to the

19  records, Plaintiff reported that he often felt depressed and angry, and that the injury occurred the

20  previous evening when Plaintiff was "intoxicated and very angry."  (AR 582-583.)  Plaintiff

21  expressed an interest in following up with his psychologist and possibly attending anger

22  management classes.  (AR 583.)  Plaintiff visited the emergency room again in May to treat

23  another finger cut, which he suffered while assisting his neighbors during a house fire.  (AR 607,

24  627, 628-630, 635.)  In August 2011 Plaintiff went to the doctor reporting visual changes and

25  vision blurriness, and received a prescription to treat those symptoms.  (AR 652.)  In March 2012

26  Plaintiff returned to the emergency room with a cut on his head from falling down the stairs while

27  intoxicated and was released after receiving treatment.  (AR 669-673.)  According to the

28  emergency room records, Plaintiff did not report any other injuries associated with the fall.  (AR

United States District Court
Northern District of California

9

674.)

B. Functional Capacity Evaluations

Apart from routine and emergency medical visits, Plaintiff underwent several examinations to measure his functional capacity in support of his application for disability benefits.  Plaintiff's primary care physicians during the relevant time period, Drs. Nunez, Pastran, and Garcia, did not submit evaluations.  Neither did Plaintiff's treating orthopedist, Dr. Goldstein.  Examining physicians Dr. David Charp and Dr. Andrew Burt completed functional capacity evaluations at the SSA's request.  Dr. P. Bianchi, a nonexamining state agency physician who reviewed the documentary evidence, also completed an evaluation.

*1. Dr. David Charp*

On May 7, 2008, Dr. David Charp, a consultative medical examiner, met with Plaintiff to assess his functional capacity.  (AR 315.)  Dr. Charp wrote a letter to the Department of Social Services with his findings and completed a "Medical Source Statement."  (AR 316-317.)  The "Medical Source Statement" is a check-the-box report that provides an opportunity for brief comments.  Dr. Charp's primary diagnosis of Plaintiff was bilateral avascular necrosis, "probably [due to] sports injuries[,]" which will require bilateral hip replacements, and "probably" lumbosacral osteoarthritis.  (AR 316.)  Dr. Charp noted that Plaintiff reported injuring his right hip while playing competitive soccer around 2004 and limping thereafter.  (AR 315.)

Dr. Charp observed that Plaintiff had a pronounced gait when he walked into the examination room and experienced discomfort when he got off the examination table to stand up.  (AR 316.)  Dr. Charp noted that Plaintiff reported pain with flexion, abduction, and adduction of both hips.  (*Id*.)  Dr. Charp also noted some tenderness in the right lateral hip and the right later proximal thigh musculature.  (*Id*.)  Dr. Charp's final prognosis was that Plaintiff needed hip replacement surgery.  (AR 318.)

In assessing Plaintiff's functional capacity, Dr. Charp opined that, due to right hip pain, Plaintiff could lift 25 pounds frequently, but could not lift more than 25 pounds repeatedly, and would only occasionally be able to lift 50 pounds.  (AR 315, 317.)  Dr. Charp further opined that Plaintiff could only walk for one to two hours within an eight hour period.  (AR 315.)  Dr. Charp

1   further concluded that in an eight-hour work day with normal breaks, Plaintiff would be able to

2   stand for less than two hours and sit for two hours, that Plaintiff needs a cane to assist him, and

3   that he would never be able to climb, balance, stoop, kneel, crouch, or crawl.  (AR 318.)

4           *2. Dr. P. Bianchi*

5           On August 12, 2011, Dr. P. Bianchi, a consultative reviewing physician, assessed

6   Plaintiff's functional capacity.  (AR 485-489.)  Dr. Bianchi did not meet, observe, or otherwise

7   examine Plaintiff, and instead based his opinion on his review of Plaintiff's medical record to date.

8   Dr. Bianchi completed a check-the-box report and two-page case analysis that provided a brief

9   discussion of the medical evidence and Plaintiff's conditions.

10          Dr. Bianchi stated that Plaintiff was able to prepare meals, do household chores, and have

11  hobbies.  (*Id.*)  Dr. Bianchi noted that Plaintiff suffered from right hip pain and his left hip was

12  also deteriorating to the point where he would likely need hip replacement surgery, but

13  commented that Plaintiff seemed capable of improving with the help of medication.  (AR 491.)  In

14  Dr. Bianchi's view, Plaintiff should be viewed as only "partially credible" due to inconsistencies

15  between reports and allegations; Dr. Bianchi did not identify the specific inconsistencies to which

16  he referred.  (*Id.*)  Dr. Bianchi further noted that Plaintiff reported difficulty standing for long

17  periods, but he followed directions well and walked up to twenty minutes without needing to rest.

18  (AR 490-491.)

19          In assessing Plaintiff's exertional limitations, Dr. Bianchi concluded that Plaintiff could

20  occasionally lift 20 pounds and frequently lift ten pounds.  (AR 486.)  He opined that Plaintiff

21  could also stand, walk, and sit with normal breaks for six hours in an eight-hour workday.  (*Id.*)

22  Elsewhere, however, Dr. Bianchi noted that Plaintiff is only able to walk for up to 20 minutes

23  before needing to rest.  (AR 490.)  Dr. Bianchi concluded that Plaintiff's lower extremities limited

24  his ability push and pull, but he did not describe the nature or degree of this limitation as the form

25  directed.  (AR 486.)  As to Plaintiff's postural limitations, Dr. Bianchi further opined that Plaintiff

26  could never balance, and could only occasionally climb ramps/stairs, balance, stoop, kneel,

27  crouch, and crawl, and climb ladders/ropes/scaffolds.  (AR 487)  Dr. Bianchi did not recommend

28  any manipulative, visual, environmental, or communicative limitations.  (AR 486-488.)

United States District Court
Northern District of California

1    Ultimately, Dr. Bianchi concluded that Plaintiff would be able to perform sedentary work.  (AR

2    491.)

3                    *3. Dr. Andrew Burt*

4            On September 10, 2013, Dr. Andrew Burt, a consultative medical examiner, met with

5    Plaintiff at SSA's request and conducted an orthopedic disability examination.  (AR 830.)  Dr.

6    Burt also reviewed Plaintiff's medical records as part of the evaluation.  (*Id.*)  He also completed a

7    questionnaire which allowed for brief comments concerning Plaintiff's impairments.  (AR 837-

8    840.)  At the time of the evaluation, Plaintiff was 38 years old and complained of "intermittent

9    pain of slight to moderate intensity at the right hip," pain-related insomnia, depression, and sexual

10   dysfunction.  (AR 835.)

11           Dr. Burt observed that Plaintiff walked with antalgic gait[17] and tended to favor his left side.

12   (AR 833.)  He noted that Plaintiff's right hip demonstrated intra-articular clicking and crepitus[18]

13   consistent with Plaintiff's history of right hip replacement.  (AR 835.)  Dr. Burt noted that Plaintiff

14   reported tenderness in the groin and the greater trochanter[19] and concluded that Plaintiff

15   experienced "atrophy of the musculature of the right lower extremity."  (AR 834-835.)  As for

16   Plaintiff's left side, Dr. Burt's inspection revealed no apparent abnormality, but he observed that

17   Plaintiff's left hip range of motion was limited due to pain; specifically, at the extremes of motion,

18   Plaintiff experienced pain and guarding, which Dr. Burt noted was consistent with aseptic necrosis

19   of the left hip.  (*Id.*)  Dr. Burt documented that Plaintiff's left hip pain was "constant" and limited

20   his ability to ambulate effectively.  (AR 831, 835.)  Dr. Burt also observed that Plaintiff avoided

21   squatting, kneeling, ascending and descending stairs, and ambulation over uneven surfaces.  (*Id.*)

22

23   _____

     [17] An antalgic gait is a gait that develops as a way to avoid pain while walking.  *See Antalgic*, The

24   Free Medical Dictionary, http://medical-dictionary.thefreedictionary.com/antalgic (last visited Jan.
     5, 2016).

25
     [18] Crepitus, characterized by a peculiar cracking, crinkly, or grating feeling or sound under a joint,

26   may indicate cartilage wear in the joint space.  *See Crepitus*, MedicineNet.com,
     http://www.medicinenet.com/script/main/art.asp?articlekey=12061 (last visited Jan. 20, 2015).

27
     [19] The greater trochanter is the point at which the hip and thigh muscles attach at the end of the

28   thigh bone.  *See Trochanter*, MedicineNet.com, http://www.medicinenet.com
     /script/main/art.asp?articlekey=10448 (last visited Jan. 20, 2016).

United States District Court
Northern District of California

1    Dr. Burt noted that Plaintiff had not returned to normal, effective ambulation within 12 months of

2    his hip replacement and was not expected to do so.  (AR 835.)

3          As far as Plaintiff's functional capacity, Dr. Burt concluded that Plaintiff was unable to lift

4    more than five or ten pounds and, at times, must recline or lie down to take the weight off his left

5    hip.  (*Id.*)  Dr. Burt opined that Plaintiff would (1) be able to stand and walk for a total of two

6    hours during an eight-hour work day, (2) need to take two to three unscheduled breaks during an

7    eight-hour work day with each break lasting about 30 minutes, and (3) would be unable to work

8    eight-hour days five days a week on a continuous basis.  (AR 836, 839.)  Dr. Burt found that

9    Plaintiff could never twist, stoop (bend), crouch/squat, climb ladders, and could only rarely climb

10   stairs.  (AR 840.)  Dr. Burt opined that Plaintiff did not need to use a cane or other assistive device

11   for standing and walking (AR 839), but concluded that Plaintiff met or equals Listings 1.01 and

12   1.02, inability to ambulate effectively without the use of a hand-held assistive device that limits

13   the functioning of both upper extremities.  (AR 835-836.)  According to Dr. Burt, all of these

14   limitations dated back to on or about September of 2007.  (AR 840.)

15          In assessing Plaintiff's mental faculties, Dr. Burt stated that Plaintiff suffered pain-related

16   insomnia that affects his ability to function in the daytime.  (AR 835.)  Dr. Burt opined that the

17   medications Plaintiff is prescribed for his hip pain contribute to his insomnia and interfere with his

18   ability to concentrate.  (*Id.*)  Dr. Burt also noted Plaintiff's "ongoing and increasing" stresses due

19   to his inability to work.  (*Id.*)  He further opined that Plaintiff would frequently be so impacted by

20   his pain symptoms as to be unable to maintain attention and concentration for even the simplest of

21   tasks.  (AR 838.)

22          Ultimately, based on his assessment of Plaintiff's physical and mental limitations, Dr. Burt

23   concluded that Plaintiff could not return to his job as a landscape laborer.  (AR 836.)  In Dr. Burt's

24   opinion, "the condition at both hips will restrict [Plaintiff] to less than a full range of sedentary

25   work."  (AR 836.)

26   **II. The ALJ Hearing**

27          On September 24, 2013, Plaintiff appeared at his scheduled hearing before the ALJ in San

28   Rafael, California.  (AR 42.)  Plaintiff was represented at the hearing by Dan McCaskell, a non-

United States District Court
Northern District of California

1    attorney representative.  (*Id.*)  Plaintiff and the VE both testified at the hearing.[20]  (*Id.*)

2         A.    Plaintiff's Testimony

3         Plaintiff suffers from pain resulting from severe hip impairments.  (AR 43.)  He has

4    suffered from hip pain since he was 31 years old.  (AR 50.)  Prior to his 2009 hip surgery, and for

5    a few months thereafter, Plaintiff used a cane to assist with walking.  (AR 50-51.)  Plaintiff has

6    never done any drugs (AR 54), but drank alcohol for about two years after surgery.  (*Id.*)  When he

7    stopped drinking, his pain levels increased.  (*Id.*)

8         As a result of his pain, Plaintiff can only walk a block or less before he needs to rest or

9    stretch by bending his knees.  (AR 52-53.)  He can only sit for about one hour at a time and

10   instead needs to lay down because of his pain.  (AR 53.)  Plaintiff also sleeps during the day

11   because the pain makes him tired.  (*Id.*)  Although sleeping makes him feel better, the pain is

12   persistent.  (*Id.*)  Plaintiff carries his cane all the time, but only uses it occasionally when his left

13   hip is swollen.  (AR 55.)  Plaintiff takes Vicodin and Ipubrofen for his pain, but the medication

14   makes him sleepy and interferes with his ability to operate vehicles.  (AR 52, 54.)  Although there

15   is damage to Plaintiff's left hip, he is still too young to undergo surgery.  (AR 52.)  Plaintiff's

16   doctor recommends that Plaintiff be given a shot to relieve some of his pain.  (*Id.*)  According to

17   Plaintiff, his doctor believes that the shot will make the pain go away, but then "the pain will be

18   worse" when the shot subsides.  (*Id.*)

19        Regarding his mental condition, Plaintiff suffers from depression.  (AR 43.)  He finds it

20   difficult to watch soccer because he is unable to play.  (AR 55.)  Plaintiff went to Kaiser for

21   mental health issues and obtained a prescription for Prozac.  (AR 54.)

22        Plaintiff also testified about his daily activities and abilities.  He only leaves the house

23   occasionally to run errands.  (*Id.*)  He helps his family by doing "little things" (AR 47): he waters

24   the small lawn, helps his mother, takes his girlfriend to and from work, takes his father to the

25   doctor, washes the dishes, and goes to the store to buy things.  (AR 54, 55-56.)  Occasionally,

26   Plaintiff cooks and does laundry.  (AR 54.)  Plaintiff noted that his father cannot go to the store,

27

28   _____

[20] Plaintiff testified with the assistance of a Spanish interpreter.  (AR 21.)

14

and his mother does not drive.  (*Id.*)  When Plaintiff goes to the store, he leans on a cart to support

his body.  (AR 55.)[21]   (AR 274-281.)

B. Vocational Expert's ("VE") Testimony

At the ALJ's request, VE Mark Kelman, who reviewed Plaintiff's file and testified to the

classifications of Plaintiff's vocational history, identified the exertional and skill levels of those

jobs, and ultimately provided testimony as to whether Plaintiff could perform past relevant work.

Although Plaintiff held several jobs before his disability, the VE classified Plaintiff primarily as a

landscape laborer, which is listed as an unskilled job with a heavy exertional level.  (AR 57.)  The

ALJ then posed several hypotheticals to the VE to determine whether there were jobs existing in

significant numbers in the national economy that Plaintiff could perform given his impairments.

The ALJ stated that she would begin with a hypothetical based on Plaintiff's past work history and

assume the following limitations:

> [L]ight work except that the individual is limited to occasional
> pushing and pulling with the bilateral lower extremity.  The
> individual is limited to occasional climbing of ramps and stairs,
> never climbing ladders, ropes or scaffolds, limited to occasional
> balancing, stooping, kneeling, crouching and crawling, they're all
> occasional.  The individual should never operate a motor vehicle or
> have exposure to moving machinery.  The individual is limited to
> simple, routine, repetitive tasks and the individual should have no
> written communication or directions in English.

(AR 58.)

The VE responded that such an individual would not be able to perform Plaintiff's past

---

[21] In addition to Plaintiff's live testimony before the ALJ, Plaintiff also submitted a "Function Report" dated March 10, 2011 as documentary evidence providing more background about his condition.  (AR 274-281.)  Although the "Function Report" Form is in English, Plaintiff answered the questions in Spanish.  Plaintiff's limited fluency in English is noted throughout the AR.  (AR 44, 277, 297, 832.)  He also stated in the report that he is unable to write in English.  (AR 277.) There is no English translation of Plaintiff's responses.  Translation from foreign language is not the Court's role. *See Calderon v. Woodford*, No. 1:07-cv-01719-LJO-YNP PC, 2009 WL 3381035, at *1 (E.D. Cal. Oct. 19, 2009) (noting that there are no statutes "authorizing the expenditure of public funds to translate non-English pleadings [even] from indigent, incarcerated plaintiffs").  Accordingly, the Court will take judicial notice of the existence of Plaintiff's "Function Report," but not its contents.  *See id.*; *see, e.g.*, *In re Toyota Motor Corp. Unintended Acceleration Mtkg., Sales Practices, & Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1187, n. 7 (C.D. Cal. Nov. 30, 2011) (noting that absent a translation, a Spanish-language website offered as evidence in support of a motion is of "little probative value," but taking judicial notice of its existence).

1   work as a landscape laborer, but would be able to do housekeeping work, which is light labor.

2   (*Id.*)  The VE testified that such an individual would also be able to work as a food preparation

3   worker, a fast food worker, or a janitorial worker.[22]  (AR 58-59.)

4        The ALJ slightly modified the hypothetical by asking whether the VE had considered

5   Plaintiff's limitations in terms of communicating and getting directions in English.  (AR 60.)  The

6   VE responded that, in his experience, he has found that supervisors are commonly bilingual in

7   Spanish and can assist individuals in understanding the necessary procedures.  (*Id.*)  Thus, the

8   English language limitations did not change the VE's opinion.

9        In her second hypothetical, the ALJ added the additional limitation that the claimant also

10  "requires . . . Spanish verbal communication and directions in Spanish."  (AR 61.)  The VE

11  responded that he would not change his response.  (*Id.*)

12       In her third hypothetical, the ALJ included the limitation that the claimant requires a cane

13  for ambulation.  (*Id.*)  The VE responded that a person cannot use a cane and be efficient at any of

14  the jobs he previously listed because to perform the light jobs, a person must be able to fully

15  ambulate effectively without the use of any assistive device.  (*Id.*)  The ALJ then asked whether

16  there were any other occupations that could be done given Plaintiff's linguistic limitations and

17  cane use.  (*Id.*)  The VE responded that this would shift the available jobs to sedentary, unskilled

18  positions such as hand packager, inspector, or sorter positions.  (AR 61-62.)

19       Next, the ALJ posed a slightly different hypothetical: that the individual be "off task 20

20  percent of the time [due] to the need to [take] additional breaks beyond normal breaks in an eight

21  hour work day."  (AR 63.)  The VE responded that there would be no work available for such a

22  person.  (*Id.*)

23       The ALJ then posed to the VE further questions about limitations on the ability to balance.

24  The VE stated that he believed that balance is necessary every day to make meals or get out of

25  bed, so therefore, when he is questioned on the ability to balance he does not believe that this

26

27  [22] At the hearing, the VE testified that he used the "second quarter" 2010 publication of the United
    States Department of Labor Division of Occupational Employment Statistics.  (AR 59.)  Because
28  of this, the VE classified janitorial worker as light, but he noted that this position would now be
    classified as medium exertional level.  (AR 58-59.)

1    would affect jobs characterized as "light work." (*Id.*)  In the VE's opinion, balance is an issue

2    when the work is at heights or includes operating heavy machinery.  (AR 63-64.)  However, the

3    VE also clarified that if one needs to use a cane to maintain balance, then it would not be possible

4    to do housekeeping or janitorial work.  (AR 64.)

5        The ALJ then asked whether occasional, frequent, constant stooping or balancing would be

6    required for housekeeping or janitorial work.  (*Id.*)  The VE responded that housekeeping work

7    requires occasional kneeling, crouching, and stooping.  (AR 64-65.)  The VE also responded that

8    janitorial work requires occasional kneeling and balancing, and frequent crawling.  (AR 65.)

9        The ALJ also asked about the math and language requirements for housekeeping and

10   janitorial work.  (*Id.*)  The VE stated that he does not focus on the language or math requirements

11   that the Department of Occupation Titles ("DOT") uses because he does not find the terminology

12   applicable "to how jobs are actually done."  (*Id.*)  At this point, the ALJ noted that the VE was not

13   a member of the American Board of Vocational Experts.  (AR 65-66.)  The VE responded that he

14   contacted employers himself to determine the level of reading expected by employees, and he also

15   has 30 years of experience interviewing monolingual employees on their experiences.  (AR 66.)

16   Lastly, the VE testified that from his knowledge of the area "easily 50 to 75 percent" of people

17   working in housekeeping and janitorial positions would have co-workers or an employer who also

18   understood Spanish.  (AR 67.)  It is unclear based on the VE's testimony whether he ultimately

19   concluded that the janitorial job was available to Plaintiff.

20       C.    Other Evidence in the Record

21       In addition to the live testimony from Plaintiff and the VE, Miguel Murillo ("Mr.

22   Murillo"), Plaintiff's brother, completed a "Third Party Function Report" on March 24, 2011.

23   (AR 282.)  Mr. Murillo usually sees Plaintiff once a week or once every two weeks.  (*Id.*)

24   According to Mr. Murillo, Plaintiff was able to clean for approximately one hour per day and do

25   laundry for approximately two to three hours per day.  (AR 284.)  Mr. Murillo stated that Plaintiff

26   spends about one hour a day making his own meals, and purchases his own food at the store.  (AR

27   284-285.)  Mr. Murillo reported that Plaintiff spends the majority of his time at home watching

28   television or talking.  (AR 286.)

1    As to Plaintiff's physical abilities, Mr. Murillo stated that Plaintiff is limited in his ability

2    to lift, walk, climb stairs, sit, kneel, stand, and reach.  (AR 287.)  Mr. Murillo also wrote that

3    Plaintiff has issues standing for a long periods of time, walking long distances, or doing anything

4    affecting his legs.  (*Id*.)  Mr. Murillo reported that Plaintiff needs 30 minute breaks after walking

5    for 20 minutes and uses a cane when he is in extreme pain.  (AR 288.)

6    **III. The ALJ's Five-Step Evaluation**

7    In an October 31, 2013 decision, the ALJ found Plaintiff not disabled under sections

8    216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act using the five-step disability analysis.

9    (AR 21-34.)  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful

10   activity since October 17, 2007, the alleged onset date.  (AR 23.)  At the second step, the ALJ

11   found that Plaintiff had the following severe impairments: status post right hip replacement, left

12   hip osteoarthritis, and depressive disorder.  (*Id*. (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).)  At

13   this step, the ALJ noted that Plaintiff also suffered from chronic low back sprain/strain, which the

14   ALJ concluded was non-severe and did not cause the claimant more than minimal functional

15   limitations.  (AR 23-24.)

16   At the third step, the ALJ found that Plaintiff did not have impairments or a combination of

17   impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part

18   404, Subpart P, Appendix 1.  (AR 24.)  Considering Plaintiff's mental impairments, under Section

19   12.04, the ALJ concluded that the evidence does not establish that Plaintiff satisfies the

20   "'paragraph B' criteria[,]'" which require two of the following: "marked restriction of activities of

21   daily living; marked difficulties in maintaining social functioning; marked difficulties in

22   maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of

23   extended duration."  (*Id*.)  The ALJ found Plaintiff mildly restricted in activities of daily living,

24   that he exhibited mild difficulties in social functioning, and moderate difficulties in maintaining

25   concentration, persistence or pace.  (AR 25.)  The ALJ found Plaintiff experienced no

26   decompensation episodes of extended duration.  (*Id*.)

27   The ALJ also concluded that the evidence did not establish that Plaintiff satisfied the

28   "'paragraph C' criteria[,]" which requires evidence of at least one of the following:

United States District Court
Northern District of California

1

> [R]epeated episodes of decompensation of extended duration; evidence of a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands, or change in the environment would be predicted to cause the individual to decompensate; or, a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

2

3

4

5

6       (*Id*.)

7           At the fourth step, the ALJ concluded that Plaintiff retained residual function capacity

8    ("RFC") to perform light work, limited to simple, routine, and repetitive tasks; with only

9    occasional pushing and pulling with his bilateral lower extremities; occasional climbing of ramps

10   and stairs; occasional balancing, stooping, kneeling, crouching, and crawling; no climbing ladders,

11   ropes, and scaffolds; and no operating motor vehicles or being exposed to moving machinery.

12   (AR 26.)  The ALJ also concluded that Plaintiff must not be given written communications or

13   directions in English, and instead must be given verbal communications or directions in Spanish,

14   and Plaintiff must use a cane for ambulation.  (*Id*.)  In making this conclusion, the ALJ found that

15   Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged

16   symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting

17   effects of these symptoms are not entirely credible."  (AR 29.)

18           Regarding Plaintiff's physical impairments, the ALJ gave great weight to the assessment of

19   Dr. Bianchi, the state agency reviewing consultant, whose opinion the ALJ concluded was

20   supported by the testimony received at the hearing, and the record as a whole.  (AR 31-32.)  The

21   ALJ gave reduced weight to the opinions of consultative examining physicians, Drs. Charp and

22   Burt.  (AR 31.)  The ALJ concluded that Dr. Charp's evaluation was both inconsistent with the

23   record as a whole and internally inconsistent, while Dr. Burt's evaluation was inconsistent with

24   the record and with Plaintiff's daily activities and had inappropriately concluded that Plaintiff's

25   cane would limit use of both of his arms.  (AR 30-31.)  The ALJ also gave both Dr. Burt's and Dr.

26   Charp's opinions reduced weight because neither was a treating physician.  (*Id*.)  Instead, the ALJ

27   gave the most weight to the opinion of the reviewing physician, Dr. Bianchi.

28           As for Plaintiff's credibility, the ALJ concluded that Plaintiff's statements as a whole "may

United States District Court
Northern District of California

19

not be entirely reliable" because his statements were inconsistent with his activities of daily living, and he made inconsistent statements regarding his work status and the cause of his impairments. (AR 29-30.)  The ALJ also concluded that Mr. Murillo's statements had only "minimal persuasive value" because he does not spend every day with Plaintiff, and thus has no first-hand knowledge of Plaintiff's daily activities and, in any event, described activities that "are not that limited."  (AR 30.)

In consideration of Plaintiff's depressive disorder, the ALJ stated that she assessed nonexertional limitations, but did not provide any explanation of what those limitations were.[23] (AR 32.)

At step four, the ALJ found that Plaintiff is unable to perform any past relevant work, but based on the testimony of the VE, Plaintiff is "capable of making a successful adjustment to other work that exists in significant number in the national economy."  (AR 33.)  The ALJ noted that the VE testified that Plaintiff could perform the job of a hand packager and inspector/sorter which are "sedentary exertional job[s]" of which there are approximately 2,000 in the California economy. (*Id*.)  Having determined that Plaintiff could perform other work, the ALJ found that Plaintiff was not disabled under the Social Security Act.  (*Id*.)

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the Court has authority to review an ALJ's decision to deny benefits.  When exercising this authority, however, the "Social Security Administration's disability determination should be upheld unless it contains legal error or is not supported by substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007); *see also Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"; it is "more than a mere scintilla, but may be less than a preponderance."  *Molina*, 674 F.3d at 1110-11 (internal citations and quotation marks omitted); *Andrews*, 53 F.3d at 1039 (same).  To determine whether the ALJ's decision is supported by

United States District Court
Northern District of California

---

[23] None of the physicians who submitted functional capacity evaluations touched on Plaintiff's mental status.  Plaintiff's challenge likewise does not address his mental health limitations.

United States District Court
Northern District of California

1   substantial evidence, the reviewing court "must consider the entire record as a whole and may not

2   affirm simply by isolating a specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d

3   1153, 1159 (9th Cir. 2012) (internal citations and quotation marks omitted); *see also Andrews*, 53

4   F.3d at 1039 ("To determine whether substantial evidence supports the ALJ's decision, we review

5   the administrative record as a whole, weighing both the evidence that supports and that which

6   detracts from the ALJ's conclusion.").

7          Determinations of credibility, resolution of conflicts in medical testimony and all other

8   ambiguities are roles reserved for the ALJ. *See Andrews*, 53 F.3d at 1039; *Magallenes*, 881 F.2d

9   at 750.  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the

10  record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal citations and

11  quotation marks omitted); *see also Batson v. Comm'r of Soc. Sec.*, 359 F.3d 1190, 1198 (9th Cir.

12  2004) ("When the evidence before the ALJ is subject to more than one rational interpretation, we

13  must defer to the ALJ's conclusion.").  "The court may not engage in second-guessing."

14  *Tommasetti*, 533 F.3d at 1039.  "It is immaterial that the evidence would support a finding

15  contrary to that reached by the Commissioner; the Commissioner's determination as to a factual

16  matter will stand if supported by substantial evidence because it is the Commissioner's job, not the

17  Court's, to resolve conflicts in the evidence." *Bertrand v. Astrue*, No. 08–CV–00147–BAK, 2009

18  WL 3112321, at *4 (E.D. Cal. Sept. 23, 2009).  Similarly, "[a] decision of the ALJ will not be

19  reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

20         However, the Court can only affirm the ALJ's findings based on reasoning that the ALJ

21  herself asserted. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).  In other words, the

22  Court's consideration is limited to "the grounds articulated by the agency[.]" *Cequerra v. Sec'y*,

23  933 F.2d 735, 738 (9th Cir. 1991).

24                                     **DISCUSSION**

25  **I. The ALJ's Consideration of the Medical Evidence**

26         A. Standard for Weighing the Medical Evidence

27         As a threshold matter, the ALJ must consider all medical opinion evidence. *Tommasetti*,

28  533 F.3d at 1041 (citing 20 C.F.R. § 404.1527(b)).  The Ninth Circuit has "developed standards

21

that guide [its] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Specifically, a reviewing court must "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The opinion of each is accorded a different level of deference, as "the opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *see also Orn*, 495 F.3d at 631 ("Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians[.]") (citation omitted).

Courts afford medical opinions of a treating physician superior weight because these physicians are in a special position to know plaintiffs as individuals and the continuity of the treatment improves their ability to understand and assess an individual's medical concerns.  *See Embrey v. Bowen*, 849 F.2d 418, 421–22 (9th Cir. 1988).  If a treating physician's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence.  *See Ryan*, 528 F.3d at 1198.  The ALJ assigns "controlling weight" to a treating doctor's opinion where medically approved diagnostic techniques support the opinion and the opinion is consistent with other substantial evidence.  *See* 20 C.F.R. § 404.1527(d)(2); *Orn*, 495 F.3d at 632-33).  Similarly, the opinion of an examining doctor, even if controverted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.  *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009); *Ryan*, 528 F.3d at 1198; *Orn*, 495 F.3d at 632; *Andrews*, 53 F.3d at 1041.

"The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting medical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986).  When determining which medical opinion should control, an ALJ looks to factors including the length of the treatment relationship, frequency of

examination, nature and extent of treatment relationship, consistency of opinion, evidence supporting the opinion, and the doctor's specialization in order to determine how much weight to assign the opinion. *See* 20 C.F.R. § 404.1527(c)(2)-(c)(6). "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (internal citation omitted). "When an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 795 F.3d at 1012-13 (internal citation omitted).

   B. Analysis

   Plaintiff contends that the ALJ erred by according reduced weight to the opinions of examining physicians Drs. Charp and Burt and instead giving the most weight to Dr. Bianchi, a nonexamining, reviewing physician.

      *1. Examining Physician Dr. Charp*

   Plaintiff does not emphasize which parts of Dr. Charp's opinion—*i.e.*, which physical limitations—the ALJ improperly rejected, nor does the ALJ make this clear. However, Dr. Charp opined that Plaintiff could not lift repeatedly more than 25 pounds; in an eight hour day could only walk for one to two hours, stand for less than two hours, and sit for less than two hours; requires a cane; and could never climb, balance, stoop, kneel, crouch, or crawl. (AR 317-318.) The ALJ's RFC was contrary to Dr. Charp's opinions about all of these exertional limitations. (AR 26, 31.) In discounting Dr. Charp's opinion, the ALJ reasoned:

> Dr. Charp's opinion is inconsistent with the record as a whole, as well as internally inconsistent. Dr. Charp noted that the claimant is limited to only two hours for sitting, and two hours for standing and walking, due to hip impairment, however, the limitations for lifting and carrying are inconsistent with these limitations. In addition, Dr. Charp was not a treating physician, and did not have the benefit of additional medical evidence of record that was received after his examination of the claimant, including the claimant's subsequent surgery for right hip replacement.

23

1    (AR 30.)  This analysis does not give sufficiently specific and legitimate reasons for discounting

2    Dr. Charp's opinions about Plaintiff's physical limitations.  *See Lester*, 81 F.3d at 830-31 (stating

3    that just like "the opinion of a treating doctor, the opinion of an examining doctor, even if

4    contradicted by another doctor, can only be rejected for specific and legitimate reasons that are

5    supported by substantial evidence in the record.").

6         While the ALJ stated that Dr. Charp's opinion is inconsistent with the record as a whole

7    (AR 30), the ALJ failed to identify specifically what evidence in the record conflicted with Dr.

8    Charp's opinion and failed to provide an interpretation of the conflicting evidence, which is not

9    enough to reject the opinion of an examining physician.  *See Lester*, 81 F.3d at 830-31.  The ALJ's

10   unsupported statement that Dr. Charp's opinion is inconsistent with the record as a whole "does

11   not set[ ] out a detailed and thorough summary of the facts and conflicting clinical evidence,

12   stat[e] h[er] interpretation thereof, and mak[e] findings."  *Reddick v. Chater*, 157 F.3d 715, 725

13   (9th Cir. 1998).  Put simply, the mere conclusion that the statement is inconsistent with the record

14   does not meet the ALJ's burden of providing specific and legitimate reasons for rejecting an

15   examining physician's opinion.  *See Valentine*, 574 F.3d at 692; *Ryan*, 528 F.3d at 1198; *Orn*, 495

16   F.3d at 632; *Lester*, 81 F.3d at 830-31.  Moreover, Dr. Charp's opinion appears to have at least

17   some support in the record, inasmuch as it overlaps significantly with the opinion of the other

18   examining physician, Dr. Burt.  (*Compare* AR 317, *with* AR 836 (both examining physicians

19   opined that Plaintiff could not sit or stand for a full 6 or 8 hour workday due to his

20   avascular/asceptic necrosis of the hip).)

21        Notably, the Commissioner goes beyond the ALJ's written decision to argue that the ALJ

22   could have rejected Dr. Charp's opinion as inconsistent with certain record evidence.  (Dkt. No. 25

23   at 4.)  Specifically, the Commissioner contends that the ALJ could have determined that Dr.

24   Charp's opinion was inconsistent with Plaintiff's December 2012 report to treating physician Dr.

25   Andrew Goldstein that he was "doing well" and has "some pain [in his] left hip area but not bad"

26   and that Plaintiff did not "think he needs surgery" and reported having "a job not requiring a lot of

27   physical activity."  (*Id.* (quoting AR 722).)  These reports may well constitute a specific and

28   legitimate reason based on substantial evidence for discounting Dr. Charp's opinion.  But the

United States District Court
Northern District of California

1  ALJ's decision did not so much as mention any of Plaintiff's later reports to Dr. Goldstein as a

2  basis for rejecting Dr. Charp's opinion, and it is well established that "[t]he Court cannot consider

3  arguments not cited or relied on by the ALJ." *Lester v. Astrue*, No. CV 09-7910-JEM, 2010 WL

4  5348610, at *4 (C.D. Cal. Dec. 21, 2010) (citing *Connett*, 340 F.3d at 874); *see also, e.g.*,

5  *Villareal v. Astrue*, No. C 12-02334 LB, 2013 WL 5372411, at *14 (N.D. Cal. Sept. 25, 2013)

6  ("The court cannot provide post-hoc rationalizations for the ALJ's decision.") (citation omitted).

7  For the same reason, the Court cannot consider the Commissioner's contention that the ALJ could

8  have rejected Dr. Charp's opinions because they were inconsistent with the limitations that

9  reviewing physician Dr. Bianchi recommended.  (Dkt. No. 25 at 4.)  Moreover, even if the Court

10 were to consider that argument, a reviewing physician's conflicting opinion on its own cannot

11 constitute substantial evidence to justify rejecting the opinion of an examining physician like Dr.

12 Charp.  *See Lester*, 81 F.3d at 830-34.  Therefore, the ALJ erred in discounting Dr. Charp's

13 opinion on the grounds that it was inconsistent with the record.

14          The same is true of the ALJ's statement that Dr. Charp's opinion was internally

15 inconsistent because Dr. Charp opined that Plaintiff "can lift and or carry up to 50 pounds

16 occasionally and 25 pounds frequently," but Plaintiff is "limited to only two hours for sitting, and

17 two hours for standing and walking[.]"  (AR 30.)  An ALJ must do more than merely "identify

18 conflicting evidence."  *Long v. Colvin*, No. 13-CV-05716-SI, 2015 WL 971198, at *6 (N.D. Cal.

19 March 3, 2015); *see also Orn*, 495 F.3d at 632 (noting that an ALJ must not only identify the

20 conflicting information, but provide an interpretation explaining the conflict).  Here, the ALJ

21 failed to provide her own interpretation of this evidence or a specific reason why this evidence was

22 internally inconsistent.  In the Court's view, these limitations affect two distinct parts of the body:

23 the ability to lift and carry, and the ability to sit, stand, and walk.  The ALJ failed to explain why it

24 is not possible for an individual to be limited—or not—in both these respects, or, for example, for

25 a person to be able to lift and carry weight while seated or with breaks for sitting.  Absent an

26 explanation, the ALJ's bare conclusion that Dr. Charp's opinion was internally inconsistent

27 because of these two limitations is not based on substantial evidence in the record, and therefore

28 cannot serve as a specific, legitimate reason to discount his opinion.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    While the ALJ correctly noted that Dr. Charp was not familiar with the entire record,

2 including Plaintiff's subsequent right hip replacement surgery, which occurred less than one year

3 after Dr. Charp examined Plaintiff and wrote his report (AR 30-31, 417), the ALJ was not entitled

4 to reject Dr. Charp's entire opinion on this basis alone.  The extent to which a medical source is

5 "familiar with the other information in [Plaintiff's] case record" is relevant in assessing the weight

6 of that source's medical opinion, however, it is but one factor the ALJ can consider in weighing a

7 medical opinion.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (setting forth factors for the ALJ to

8 consider in assessing the weight of medical opinions); *see also Boghossian v. Astrue*, No. CV 10–

9 7782–SP, 2011 WL 5520391, at *4 (C.D. Cal. Nov. 14, 2011) (noting that a limited review of the

10 record is not sufficient by itself to reject a treating physician's opinion) (citation omitted).  Here,

11 the ALJ determined that Dr. Charp's limited review of the record serves as a basis for giving less

12 weight to his whole opinion, but Dr. Charp's opinion cannot be disregarded in its entirety only

13 based on this proffered reason.  *See* 20 C.F.R. §§ 404.1527(d)(6), 416.927(d)(6); *see, e.g.*,

14 *Boghossian*, 2011 WL 5520391, at *4 (a limited review of the record is not sufficient by itself to

15 reject a treating physician's opinion) (citation omitted).  This is especially the case where, as here,

16 Dr. Burt's later medical opinion, developed with the benefit of the later records, is similar to Dr.

17 Charp's opinion and, if anything, reports a continued pattern of deterioration.  Thus, that Dr.

18 Charp's report predated Plaintiff's subsequent hip surgery does not provide substantial evidence

19 for rejecting his opinion in its entirety.

20    The ALJ also correctly noted that Dr. Charp was not Plaintiff's treating physician, but the

21 ALJ cannot disregard an opinion solely because it is not from a treating physician.  *See Andrews*,

22 53 F.3d at 1041.  Where, as here, the record lacks a medical opinion from a treating physician, the

23 ALJ's bare assertion that Dr. Charp's whole opinion should be given less weight because he is not

24 a treating physician is not only conclusory, but legally wrong: in particular in the absence of an

25 opinion from a treating physician, the opinion of an examining physician is entitled to the most

26 weight absent specific and legitimate reasons to the contrary supported by substantial evidence.

27 *See Orn*, 495 F.3d at 632 (internal citation and quotation marks omitted).  The ALJ has not

28 provided as much.  Thus, that Dr. Charp is not a treating physician is not sufficient to justify the

reduced weight the ALJ assigned his opinion.

In short, because the ALJ did not provide specific and legitimate reasons supported by substantial evidence for rejecting Dr. Charp's opinion about Plaintiff's limitations, the ALJ was not permitted to give the opinion reduced weight.  Dr. Charp's opinion—including his conclusions that Plaintiff is limited to walking, standing, and sitting for less than two hours in an eight hour work day and that he can never climb, balance, stoop, kneel, crouch, or crawl—was therefore entitled to more weight than the ALJ provided.

### 2. Examining Physician Dr. Burt

Plaintiff next contends that the ALJ erred by according "reduced weight" to the opinion of Dr. Burt, who concluded in relevant part that Plaintiff: could not lift more than five or ten pounds; would need to take two to three unscheduled; could never twist, stoop, crouch, squat, climb ladders; could only rarely climb stairs; would need 30-minute breaks during an eight hour work day; would be unable to work eight-hour days five days a week on a continuous basis; and could not return to his job as a landscape laborer.  (AR 835-840.)  The ALJ discounted Dr. Burt's opinion in its entirety on the grounds that: (1) Dr. Burt's opinion was both inconsistent with the record as a whole, as well as with Plaintiff's activities of daily living; (2) Dr. Burt's determination of Plaintiff's disability status is an issue ultimately reserved for the Commissioner; and (3) Dr. Burt diagnosed Plaintiff with a "fair" result after his right hip replacement.  (AR 31.)

Plaintiff first contends that the ALJ erred by rejecting Dr. Burt's opinion because, contrary to the ALJ's statement, it was inconsistent with Plaintiff's activities of daily living.  On this point, the ALJ noted that "claimant is able to drive, do minimal household chores, such as laundry and dishes, and is able to watch soccer games and television."  (*Id.*)  Although it is undisputed that Plaintiff engaged in these daily activities, the ALJ failed to explain or point to any evidence which shows that these activities are inconsistent with Dr. Burt's opinions of Plaintiff's limitations; merely listing activities is insufficient.  *See Orn*, 495 F.3d at 632.  Absent an explanation, it is improper to assume that because Plaintiff performs limited tasks that he does not deserve benefits or would have no difficulties in a work setting.  *See Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (ordering award of benefits for constant back and leg pain despite Plaintiff's ability to

United States District Court
Northern District of California

27

1   prepare meals and wash dishes). The Commissioner now offers an explanation of why Dr. Burt's

2   opinion conflicts with these activities, contending that the level of activity that Plaintiff and his

3   brother described does not square with "Dr. Burt's portrayal of an individual who cannot even

4   concentrate on simple tasks two-thirds of the time and is unable to stand and/or walk more than

5   one-fourth of the workday." (Dkt. No. 25 at 6.) But the ALJ offered no such account. As

6   explained above, the Court's analysis is cabined to the reasons the ALJ gave, not justifications the

7   Commissioner may offer after-the-fact. *See Connett*, 340 F.3d at 874; *Lester*, 2010 WL 5348610,

8   at *4 (citation omitted); *Villareal*, 2013 WL 5372411, at *14 (citation omitted). The ALJ's bare

9   assertion that Plaintiff's activities of daily living are inconsistent with Dr. Burt's opinion is neither

10  a specific nor legitimate reason supported by substantial evidence in the record to give reduced

11  weight to Dr. Burt's opinion. *Andrews*, 53 F.3d at 1041.

12          On the other hand, the ALJ did provide other specific and legitimate reasons for rejecting

13  part of Dr. Burt's opinion—specifically, his opinion about Plaintiff's ability to "ambulate

14  effectively" and meet certain related impairment listings. The ALJ noted that Dr. Burt's opinion

15  was inconsistent with the record as a whole because Dr. Burt opined that Plaintiff was disabled

16  under Listing 1.02 or 1.03—inability to ambulate effectively—but according to the record Plaintiff

17  uses a cane. (AR 31.) "[I]nability to ambulate effectively" is the claimant's use of "a hand-held

18  assistive device . . . [that] limits the functioning of both upper extremities." *See* 20 C.F.R. pt. 404,

19  subpt. P, app. 1, § 1.00(B)(2)(b)(1) (2016). The record reflects that Plaintiff uses a cane that does

20  not limit both of his upper extremities for walking support, and instead requires only one arm.

21  (AR 51, 288, 317). The record therefore contradicts Dr. Burt's opinion that Plaintiff could not

22  walk without a device that limits both arms. On the same issue, the ALJ also correctly noted that

23  Dr. Burt's opinion was internally inconsistent because "[Dr. Burt] opined that claimant does not

24  even need to use any assistive device at all, yet, still opined that the claimant meets or equals

25  Listing 1.02 and 1.03 [that] . . . require the inability to ambulate effectively due to the need for

26  handheld assistive devices." (AR 31.) Specifically, Dr. Burt opined that Plaintiff qualifies for

27  benefits under the Listing of Impairments, Section 1.01, Paragraph 1.02 and 1.03, then, at the

28  same time, checked a box on his functional capacity evaluation form that states that Plaintiff does

1    not use a cane or other assistive device while engaging in occasional sitting and standing.  (AR

2    839.)  Although the ALJ may have given the check-the-box report too much significance, *see*

3    *Murray v. Heckler*, 722 F.2d 499, 501 (9th Cir. 1983) (noting a preference for detailed reports

4    over forms with check mark boxes that lack explanation), it is not for this Court to make that type

5    of determination.

6         Thus, given that the ALJ identified a specific example of how Dr. Burt's opinion

7    contradicts evidence in the record, the ALJ "met h[er] burden," and this proffered reason is an

8    appropriate basis on which to give reduced weight to Dr. Burt's opinion about Plaintiff's cane use

9    and ability to ambulate effectively.  *See Cotton*, 799 F.2d at 1407.  But the ALJ said nothing to

10   explain why this single discrepancy is grounds to reject or give reduced weight to Dr. Burt's

11   opinion in its entirety.  While the Commissioner offers that this discrepancy is grounds to "dr[a]w

12   an adverse inference as to the reliability of Dr. Burt's opinion" as a whole (Dkt. No. 25 at 6), the

13   ALJ did not say so, and therefore did not adequately justify applying reduced weight to the rest of

14   Dr. Burt's limitation opinions.

15        The ALJ also gave Dr. Burt's opinion reduced weight because "an opinion by a medical

16   source that a claimant is disabled or unable to work does not mean that a claimant is disabled.  The

17   determination of disability is an issue reserved to the Commissioner and, as such, is an

18   administrative finding that directs the determination or decision of disability."  (AR 31.)  An

19   "administrative law judge is not bound by the uncontroverted opinions of the claimant's

20   physicians on the ultimate issue of disability, but he cannot reject them without presenting clear

21   and convincing reasons for doing so."  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993)

22   (citation omitted); *see also Reddick*, 157 F.3d at 725 (noting that in disability benefit cases

23   "physicians may render medical, clinical opinions, or they may render opinions on the ultimate

24   issue of disability—the claimant's ability to perform work"); *Lester*, 81 F.3d at 830.  Thus,

25   without any clear and convincing reason, the ALJ's statement that Dr. Burt's opinion on the

26   ultimate issue of disability should be given reduced weight on this basis is unpersuasive.

27        The ALJ also stated that she was discounting Dr. Burt's opinion (presumably in its

28   entirety, but she did not clarify) because Dr. Burt diagnosed Plaintiff's hip as being in "fair" status

United States District Court
Northern District of California

29

1    following his hip replacement.  (AR 31.)  The ALJ did not explain why this evidence supports

2    giving part or the whole of Dr. Burt's opinion less weight, let alone provide any basis for her

3    conclusion.  The conclusory statement alone is not enough.  *See Garrison*, 795 F.3d at 1012-13

4    (citation omitted); *Lester*, 81 F.3d at 830-31 (citation omitted).

5        The ALJ also failed altogether to address some of Dr. Burt's findings, which she neither

6    rejected nor included in Plaintiff's RFC.  (*See* AR 31.)  To be sure, an ALJ need not incorporate

7    every facet of a physician's opinion into the RFC.  *See* C.F.R. § 404.1545(a)(1) (noting that the

8    ALJs consider the evidence as a whole in formulating the claimant's RFC).  Nor must the ALJ

9    "*discuss* all evidence."  *Vincent ex rel. v. Heckler*, 739 F.2d 1393, 1394 (9th Cir. 1984) (emphasis

10   in original).  However, the ALJ must consider all evidence in the record as a whole and cannot

11   pick and choose which evidence she relies on to reach a desired conclusion.  *See Gallant*, 753 F.2d

12   at 1456 (error for an ALJ to ignore or misstate the competent evidence in the record in order to

13   justify her conclusion).  Moreover, the ALJ is required to "explain why significant probative

14   evidence has been rejected."  *Vincent*, 739 F.2d at 1395 (internal citation and quotation marks

15   omitted).  Here, the ALJ failed to credit or to articulate reasons for rejecting Dr. Burt's findings

16   that Plaintiff: could not work an eight-hour day, needed frequent breaks, experienced pain that

17   would frequently interfere with Plaintiff's attention and concentration, and could not walk more

18   than two city blocks without rest or severe pain.  (AR 31, 838-839).  These limitations are

19   consistent with other evidence in the record, particularly with the opinion of Dr. Charp, the other

20   examining physician.  For example, both Dr. Charp and Dr. Burt opined that Plaintiff would need

21   frequent breaks.  (*See, e.g.*, AR 318, 839.)  Nevertheless, the ALJ gave Dr. Burt's entire opinion

22   reduced weight principally due to the one inconsistency regarding Plaintiff's ability to ambulate.

23   Aside from the ability to ambulate limitation, the ALJ failed to give specific and legitimate

24   reasons based on substantial evidence for doing so.  The ALJ did not meet her burden of providing

25   rationale for giving reduced weight to Dr. Burt's findings.

26        *3. Reviewing Physician Dr. Bianchi*

27        While Plaintiff does not affirmatively argue that the ALJ erred by giving Dr. Bianchi's

28   opinion too much weight, such an argument is implicit in his contention that the ALJ gave too

United States District Court
Northern District of California

30

United States District Court
Northern District of California

1    little weight to the opinions of the examining physicians.  As described above, the opinion of a

2    non-examining, reviewing physician normally is entitled to less deference than that of an

3    examining physician because the reviewing physician does not have the opportunity to

4    independently examine the claimant.  *See Andrews*, 53 F.3d at 1040-41.  Indeed, "[t]he opinion of

5    a nonexamining physicians cannot by itself constitute substantial evidence that justifies the

6    rejection of the opinion of . . . an examining physician" in its favor.  *Lester*, 81 F.3d at 831

7    (citations omitted); *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990) (noting that the

8    nonexamining doctor's opinion "with nothing more" does not constitute substantial evidence).

9    Nevertheless, the ALJ gave "substantial weight" to Dr. Bianchi's opinion—namely, that Plaintiff

10   can occasionally lift 20 pounds and frequently lift ten pounds; can stand or walk about six hours

11   with normal breaks in an eight-hour workday; is limited in his ability push and pull; is

12   occasionally limited in his ability to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl;

13   and is never limited in his ability to climb ladders/ropes/scaffolds—instead of the conflicting

14   opinions of the two examining physicians.  (AR 31-32, 486-487.)  The ALJ reasoned that "Dr.

15   Bianchi's opinion is consistent with the record as a whole, as well as with . . . [Plaintiff]'s

16   activities of daily living," and "there is no conflicting opinion from a treating physician."  (AR

17   32.)  This explanation is inadequate for three reasons.

18          First, the ALJ noted that Dr. Bianchi's opinion is consistent with the record as a whole in

19   insofar as the limitations he offered are "supported by testimony received at the hearing, as well as

20   medical evidence and source statements in the record."  (AR 32.)  But the ALJ did not elaborate

21   any further on this point.  The conclusory statement that Dr. Bianchi's opinion is consistent with

22   the record is not enough to weigh his opinion more heavily than those of the reviewing physicians.

23   *See Embrey*, 849 F.2d at 421-22; *Lester*, 81 F.3d at 831 (citations omitted).  What record evidence

24   squares with Dr. Bianchi's recommendations of Plaintiff's functional capacity?  The ALJ's

25   opinion leaves the Court to guess.  Given that Dr. Bianchi's opinion conflicts with those of Drs.

26   Charp and Burt, having failed to provide any detailed, reasoned, and legitimate reasons for giving

27   more weight to opinion of reviewing physician, the ALJ erred.  *See Lester*, 81 F.3d at 831 (citation

28   omitted); *Pitzer*, 908 F.2d at 506 n.4.

1    Second, the ALJ asserted in boilerplate language that Dr. Bianchi's opinion is consistent

2    with Plaintiff's activities of daily living without providing any substantive basis for that

3    conclusion, which is not enough to accept a reviewing physician's opinion over those of

4    examining physicians. *See Garrison*, 795 F.3d at 1012-13 (internal citation omitted); *Lester*, 81

5    F.3d at 831 (internal citation omitted).

6    The ALJ's third stated reason for giving the most weight to Dr. Bianchi's opinion is

7    equally unavailing. While the ALJ accurately noted that there is no conflicting opinion by a

8    treating physician (AR 32), without more, this alone is not reason to weigh a reviewing

9    physician's entire opinion more heavily than those of examining physicians. *See Embrey*, 849

10   F.2d at 421-22. Accordingly, the ALJ improperly used the absence of a treating physician to

11   support the credibility of Dr. Bianchi.

12   There are other things about Dr. Bianchi's opinion that give the Court pause as to why the

13   ALJ gave it substantial weight. First, it appears that Dr. Bianchi did not review all the evidence in

14   Plaintiff's record. Dr. Bianchi noted in his report that medical source statements regarding

15   Plaintiff's physical capabilities were not in the file, so he did not review them. (AR 489.) Dr.

16   Bianchi conducted his review and report three years after Dr. Charp, whose medical opinion

17   should have been in Plaintiff's file. Thus, it appears that Dr. Bianchi's opinion might have been

18   given reduced weight because the medical record he reviewed lacked certain information. *See*

19   C.F.R. §§ 404.1527(c)(4), (c)(6), 416.927(c)(4), (c)(6) (setting forth factors for the ALJ to

20   consider in assessing the weight of medical opinions).

21   Additionally, Dr. Bianchi's opinion was internally inconsistent. Dr. Bianchi opined that

22   Plaintiff can stand or walk about six hours with normal breaks in an eight-hour workday (AR 486),

23   but elsewhere concluded that Plaintiff has "difficulty standing for long periods." (AR 491.) The

24   ALJ did not identify this inconsistency or appear to consider it in weighing the credibility of Dr.

25   Bianchi's opinion, but nonetheless appears to have accepted both conflicting opinions.

26   Most troubling, Dr. Bianchi's opinion conflicts with the opinion of the two examining

27   physicians. For example, Dr. Bianchi opined that Plaintiff can walk six hours in an eight-hour

28   day, while Dr. Charp opined that Plaintiff could only walk for one to two hours within an eight-

United States District Court
Northern District of California

32

1    hour period, and Dr. Burt opined that "on a good day" Plaintiff can only walk two blocks.

2    (*Compare* AR 490-491, *with* AR 318, 835.)  Likewise, Dr. Bianchi opined that Plaintiff is only

3    occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl, while both

4    Drs. Charp and Burt opined that Plaintiff can never balance, stoop, kneel, crouch, and crawl, and

5    Dr. Burt opined that Plaintiff could only rarely climb stairs.  (*Compare* AR 487, *with* AR 318,

6    840.)  Given the ALJ's failure to adequately justify rejecting the opinions of the examining

7    physicians, these inconsistencies show that ALJ improperly characterized the opinion of Dr.

8    Bianchi as consistent with the record as a whole.  At bottom, the ALJ accepted the contested

9    opinion of a reviewing physician without providing legally sufficient justification for weighing it

10   more heavily than the conflicting opinions of the examining physicians.  This is error.

11                                                    *   *   *

12       In sum, the ALJ erred by failing to identify specific and legitimate reasons to discount the

13   opinions of examining physicians Drs. Charp and Burt and according the most weight to the

14   reviewing physician's opinion without adequate explanation or support.  Given that the ALJ's

15   entire decision improperly relied on Dr. Bianchi's opinion inasmuch as it formed the basis for the

16   RFC that, in turn, underpinned the disability determination, the Court cannot conclude that any

17   such error was harmless.

18   **II. The ALJ's Consideration of Plaintiff's Subjective Pain Testimony**

19       Plaintiff next asserts that the ALJ failed to sufficiently justify her finding not credible

20   Plaintiff's testimony.  (Dkt. No. 20 at 13.)  The ALJ also erred in her evaluation of Plaintiff's

21   testimony, but any error was harmless.

22       A.    Standard for Assessing Credibility

23       "An ALJ engages in a two-step analysis to determine whether a claimant's testimony

24   regarding subjective pain or symptoms is credible."  *Garrison*, 759 F.3d at 1014.  "First, the ALJ

25   must determine whether the claimant has presented objective medical evidence of an underlying

26   impairment which could reasonably be expected to produce the pain or other symptoms alleged."

27   *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal citations and quotation marks

28   omitted).  "Second, if the claimant meets this first test, and there is no evidence of malingering,

United States District Court
Northern District of California

33

1    the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering

2    specific, clear and convincing reasons for doing so." *Id.* (internal citations and quotation marks

3    omitted).  "The clear and convincing standard is the most demanding required in Social Security

4    cases." *Garrison*, 759 F.3d at 1014 (citation omitted).

5         However, the ALJ is not "required to believe every allegation of disabling pain, or else

6    disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C.

7    § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Most commonly, a claimant's

8    credibility is called into question where his or her complaint is about "disabling pain that cannot

9    be objectively ascertained." *Orn*, 495 F.3d at 637.  "In weighing a claimant's credibility, the ALJ

10   may consider his reputation for truthfulness, inconsistencies either in his testimony or between his

11   testimony and his conduct, his daily activities, his work record, and testimony from physicians and

12   third parties concerning the nature, severity, and effect of the symptoms of which he complains."

13   *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citation omitted); *see also* 20 C.F.R.

14   § 404.1529(c)(3).  An ALJ must do more than offer "conclusory statements" without an

15   explanation or a reason to discredit a plaintiff's testimony.  *Brown-Hunter v. Colvin*, 806 F.3d

16   487, 494 (9th Cir. 2015); *see also Vasquez v. Astrue*, 572 F.3d 586, 592 (9th Cir. 2009) ("To

17   support a lack of credibility finding, the ALJ was required to point to specific facts in the

18   record[.]").  Thus, "[g]eneral findings are insufficient; rather, the ALJ must identify what

19   testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81

20   F.3d at 834; *see also Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996) ("The ALJ must state

21   specifically which symptom testimony is not credible and what facts in the record lead to that

22   conclusion.").

23         B.    Any Error in Assessing Plaintiff's Credibility was Harmless

24         Applying the two-step analysis, the ALJ found that Plaintiff's "medically determinable

25   impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's

26   "statements concerning the intensity, persistence and limiting effects of these symptoms are not

27   entirely reliable."  (AR 29.)  The ALJ did not find that Plaintiff was malingering; she was thus

28   required to set forth specific, clear, and convincing reasons for rejecting Plaintiff's pain testimony

34

1   under the second prong of the test, *see Lingenfelter*, 504 F.3d at 1036, and to consider the relevant

2   factors, *see Light*, 119 F.3d at 792.  A review of the record indicates that the ALJ fell short of

3   doing so.  Here, the ALJ explained that she found Plaintiff's subjective complaints not credible

4   given his activities of daily living and his inconsistent statements regarding his work status and the

5   cause of his impairments.

6          When evaluating credibility, an ALJ may consider "the claimant's daily activities."  20

7   C.F.R. §§ 404.1529(c)(3)(i), 416.919(c)(3)(i); *see also Fair*, 885 F.2d at 603 (stating that the

8   claimant's daily activities may be evidence upon which an "ALJ can rely to find a pain allegation

9   incredible").  An ALJ "may discredit a claimant's testimony when the claimant reports

10  participation in everyday activities indicating capacities that are transferable to a work setting."

11  *Molina*, 674 F.3d at 1113 (internal citations and quotation marks omitted).  Put simply,

12  "[i]nconsistencies between a claimant's testimony and the claimant's reported activities provide a

13  valid reason for an adverse credibility determination."  *Burrell v. Colvin*, 775 F.3d 1133, 1137-38

14  (9th Cir. 2014); *see, e.g.*, *Brown-Hunter*, 806 F.3d at 493; *see also Kelly v. Astrue*, 471 F. App'x

15  674, 677 (9th Cir. 2012) (holding that the ALJ properly made an adverse credibility finding

16  because, in part, the plaintiff's daily activities included driving, washing the dishes, shopping, and

17  caring for her two children).  Moreover, "[e]ven where those activities suggest some difficulty

18  functioning, they may [still] be grounds for discrediting the claimant's testimony to the extent that

19  they contradict claims of totally debilitating impairment."  *Id.*  In assessing a claimant's

20  credibility, in addition to the claimant's daily activities, the SSA requires ALJs to consider

21  additional factors, including: whether the claimant takes medication or undergoes other treatment

22  for the symptoms; whether the claimant fails to follow a prescribed course of treatment without

23  adequate explanation; and whether the alleged symptoms are consistent with the medical evidence.

24  *Lingenfelter*, 504 F.3d at 1040; *see also Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2011);

25  *Fair*, 885 F.2d at 602-03.

26          Here, the ALJ accurately detailed Plaintiff's activities of daily living.  As a threshold

27  matter, part of the ALJ's rejection of Plaintiff's subjective testimony based on his activities of

28  daily living is based on the ALJ's concomitant rejection of Plaintiff's brother's third-party

statement.  (AR 30.)  "While an ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing 'reasons that are germane to each witness.'"  *Brown v. Astrue*, 405 F. App'x 230, 233 (9th Cir. 2010) (citing *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006)).  Specifically, the ALJ found "minimally persuasive value" in Plaintiff's brother's statements, among others, that Plaintiff "can no longer play, run, move freely, or stand for long periods of time[,]" "cannot work due to being in pain." (*Id.*)  At the same time, Plaintiff's brother reported that Plaintiff is able to engage in a litany of daily activities—including meal preparation, laundry, socializing, and leaving the house for errands—without many limitations.  (*Id.*)  The ALJ stated that Plaintiff's brother's statements were "partially credible[,]" but "minimally persuasive" because Plaintiff's brother "does not spend that much time with the claimant on a daily basis, and therefore[ ] would not have first-hand knowledge of the claimant's activities of daily living."  (*Id.*)  While the Court or another ALJ may have reached a different conclusion about the reliability of Mr. Murillo's testimony, the ALJ's reasoned explanation for not relying on it is sufficient.  The Court therefore construes the ALJ as relying only on Plaintiff's testimony of his activities of daily living and his reports to physicians.

With respect to those activities, the ALJ noted that Plaintiff is able "to do minimal household chores, drive, go shopping, and visit his children and girlfriend."  (AR 29.)  The ALJ also noted that Plaintiff (1) cut his finger at a neighbor's house during a fire, which would indicate he "was attempting to provide assistance," and (2) reported pain while riding a bike and driving a manual transmission with a clutch.  (*Id.*)  The ALJ concluded that all of these activities are inconsistent with Plaintiff's allegations of symptoms and limitations that prevent all work.  (*Id.*)  Although the SSA does not require claimants be "utterly incapacitated," a specific finding as to a claimant's ability to spend a substantial part of his day engaged in activities involving the performance of physical activity transferable to a work setting may be sufficient to discredit allegations of severe pain.  *Fair*, 885 F.2d at 603.  In this instance, the ALJ found, based on Plaintiff's testimony and self-reports that Plaintiff spends a fair amount of time engaged in activities other than lying down.  The record does not indicate how frequently Plaintiff engaged in the household chores, shopping, or social visits.  And while it does reflect that Plaintiff rode a bike

36

and drove a car, the ALJ failed to acknowledge that Plaintiff reported pain while engaged in these activities.  Nor did the ALJ indicate precisely what alleged limitations conflicted with these activities of daily living, which is inconsistent with the Ninth Circuit's specificity requirements. *See Lingenfelter*, 504 F.3d at 1036; *Garrison*, 759 F.3d at 1014; *see also Burrell*, 775 F.3d at 1137 (finding the ALJ's rejection of the claimant's testimony insufficient where "the ALJ did not elaborate on *which* daily activities conflicted with *which* part of Claimant's testimony.") (emphasis in original).  For example, in *Molina* the Ninth Circuit upheld the ALJ's conclusion that the claimant was not credible because the claimant's "inability to tolerate even minimal human interaction" was inconsistent with the activities of daily living.  674 F.3d at 1113.  Here, in contrast, the ALJ only stated that Plaintiff's "symptoms are not entirely credibly for the reasons explained in this decision."  (AR 29.)  Having failed to address these considerations, the ALJ's conclusory statement that Plaintiff's activities of daily living conflict with his reported pain and symptoms is not a clear and convincing reason to reject his testimony.

Nor did the ALJ address the other required considerations set forth in *Lingenfelter*, which leaves her explanation wanting: there is no discussion of Plaintiff's medication or treatment for his symptoms, his failure to follow such treatment, or whether his alleged symptoms are consistent with the medical evidence.  *See Lingenfelter*, 504 F.3d at 1040.  The Court is also skeptical that some of the activities that the ALJ listed as undercutting Plaintiff's pain testimony actually do so.  For example, a single incident of Plaintiff rushing to aid a neighbor in need does not reflect that Plaintiff regularly spends substantial amounts of time standing or walking to the extent that these actions are transferable to a work environment.  *See Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001) ("One does not need to be utterly incapacitated in order to be disabled.") (internal quotation marks and citation omitted); *see also Reddick*, 157 F.3d at 722 ("Disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.") (citation omitted).  Thus, the ALJ did not adequately support her rejection of Plaintiff's subjective pain testimony based on his activities of daily living.

On the other hand, the ALJ also discredited Plaintiff's testimony on the grounds that Plaintiff made inconsistent statements regarding his work status and the cause of his impairments.

37

1    (AR 29-30.)  In evaluating the claimant's testimony, the ALJ "may consider inconsistencies . . . in

2    the claimant's testimony[.]"  *Molina*, 674 F.3d at 1112.  An ALJ's adverse credibility finding may

3    be based in part due to a claimant's inconstant statements to her doctors.  *See Thomas v. Barnhart*,

4    278 F.3d 947, 959 (9th Cir. 2002).

5         Here, in discussing the cause of Plaintiff's impairments, the ALJ identified the testimony

6    she found not credible, and explained which evidence contradicted that testimony with specific

7    examples that allow for a meaningful review of the ALJ's credibility determination.  *Brown-*

8    *Hunter*, 806 F.3d at 494 (internal citation omitted).  With respect to Plaintiff's allegedly

9    conflicting statements about his work status, the ALJ noted that in July 2008, Plaintiff reported to

10   a physician his intent to retrain or go to school, but the medical records do not state again whether

11   Plaintiff actually ever attempted to retrain or return to school.  (*Id.*)  The ALJ further noted that, in

12   December 2012, Plaintiff told his orthopedist, Dr. Goldstein, "that he currently has a job that does

13   not require a lot of physical activity."  (*Id.*)  In short, the inconsistency the ALJ appeared to

14   identify is that Plaintiff earlier stated that he would retrain for a new job or study but actually

15   ended up working.  There is nothing inconsistent about Plaintiff intending to retrain or to go to

16   school, and then four years later finding a job; he may still have wanted to retrain or go back to

17   school at that time.  The Court therefore concludes that this is not a clear and convincing reason

18   for finding Plaintiff's testimony unreliable.

19        However, the result is different with respect to the cause-of-injury testimony.  The ALJ

20   noted that Plaintiff told Dr. Charp in 2008 that he "injured his hips playing competitive soccer in

21   2004[,]" but told Dr. Burt in 2010 that "his hips began gradually hurting in 2005, after he began

22   working as a landscape laborer, and the claimant did not cite any specific injury as the cause for

23   the pain in his hips."  (AR 30.)  Because the ALJ identified inconsistencies within Plaintiff's

24   statements, the ALJ cited specific, clear and convincing reasons to support her adverse credibility

25   finding on this basis.  While the apparent inconsistent testimony only pertained to the initial cause

26   of injury, the ALJ specifically noted that "the inconsistencies suggest that the information

27   provided by the claimant generally may not be entirely reliable."  (AR 30.)  While the Court, and

28   perhaps other ALJs, may have excused these inconsistencies, they fairly contribute to the ALJ's

United States District Court
Northern District of California

1    ultimate adverse credibility finding.

2                                        *   *   *

3           In sum, the ALJ sufficiently justified discounting Plaintiff's testimony about when and

4    how his injury initially arose, and adequately explained that this inconsistency suggested that

5    Plaintiff's testimony was not entirely reliable.  Thus, although the ALJ provided some invalid

6    reasons for discrediting the Plaintiff's testimony—namely, the inadequately explained

7    inconsistency with activities of daily living—she also provided valid reasons supported by the

8    record for doing so.  The ALJ's failure to adequately explain why Plaintiff's subjective pain

9    testimony was inconsistent with his activities of daily living is therefore harmless.  *See Molina*,

10   674 F.3d at 1115 (noting that an error is harmless where the ALJ provides one or more invalid

11   reasons for discrediting a claimant's testimony, but also provides valid reasons that were

12   supported by the record); *Batson*, 359 F.3d at 1197 (concluding that even if the record does not

13   support one of the ALJ's reasons for discrediting a claimant's testimony, the error is harmless).

14   **III.    Reversal or Remand**

15          In light of the ALJ's legal error in weighing the medical evidence, the Court must

16   determine whether to remand this case to the SSA for further proceedings or with instructions to

17   award benefits.  A district court may "revers[e] the decision of the Commissioner of Social

18   Security, with or without remanded the cause for a rehearing," *Treichler v. Comm'r of Soc. Sec.*

19   *Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original),

20   but "the proper course, except in rare circumstances, is to remand to the agency for additional

21   investigation or explanation," *id.* (citation omitted).  Ninth Circuit case law "precludes a district

22   court from remanding a case for an award of benefits unless certain prerequisites are met."

23   *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) (citing *Burrell*, 775 F.3d at 1141).  "The

24   district court must first determine that the ALJ made a legal error, such as failing to provide

25   legally sufficient reasons for rejecting evidence." *Id.* (citation omitted).  "If the court finds such

26   an error, it must next review the record as a whole and determine whether it is fully developed, is

27   free from conflicts and ambiguities, and all essential factual issues have been resolved." *Id.*

28   (internal quotation marks and citation omitted).  In doing so, "the district court must consider

United States District Court
Northern District of California

39

whether there are inconsistencies between [the claimant's] testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled." *Id.* (internal quotation marks and citation omitted) (alteration in original).  "Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits." *Id.* (citation omitted).

On the other hand, if the court determines that the record has, in fact, been fully developed and there are no outstanding issues left to be resolved, then it next must consider whether "the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true." *Id.* (internal quotation marks and citation omitted).  Put another way,

> the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true.  If so, the district court may exercise its discretion to remand the case for an award of benefits.

*Id.* (citation omitted).  But courts are not required to exercise such discretion.  *Id.* (citations omitted); *see also Connett*, 340 F.3d at 874-76; *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Instead, district courts "retain 'flexibility' in determining the appropriate remedy[.]" *Burrell*, 775 F.3d at 1141 (quoting *Garrison*, 759 F.3d at 1021).  Specifically, the court "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" *Burrell*, 775 F.3d at 1141 (quoting *Garrison*, 759 F.3d at 1021); *see also Connett*, 340 F.3d at 874-76 (finding that a reviewing court retains discretion to remand for further proceedings even when the ALJ fails to "assert specific facts or reasons to reject [the claimant's] testimony").

Applying these principles here, the Court's conclusion that the ALJ erred in rejecting the treating physicians' opinions without adequate explanation meets the threshold requirement of legal error in failing to provide legally sufficient reasons for rejecting evidence.  *See Dominguez*, 808 F.3d at 408.  The next question is whether the record has been fully developed and further

40

United States District Court
Northern District of California

1    administrative proceedings would serve no useful purpose.  *Id.* (citing *Burrell*, 775 F.3d at 1141).

2         Drs. Charp and Burt, whose opinions the ALJ erred in discrediting, both opined that

3    Plaintiff would not be able to work an eight-hour work day without additional breaks.  (AR 318,

4    836, 839).  But the record leaves open the question of Plaintiff's exact disability status, as there

5    are some inconsistencies between the two physicians' recommendations and some issues that may

6    lead an ALJ to weigh parts of the opinions more heavily than others.  For example, Dr. Burt

7    opined that Plaintiff would need two to three 30-minute unscheduled breaks per day (AR 839),

8    while Dr. Charp opined that Plaintiff would only be able to stand/walk for less than two hours in a

9    workday with normal breaks.  (AR 317.)  Notably, Dr. Charp's medical source statement was

10   submitted a year before Plaintiff's right hip replacement surgery, and the Commissioner pointed

11   out that parts of his opinion could be deemed inconsistent with Plaintiff's medical records from his

12   treating physician years later, in which Plaintiff reported significant improvement.  (*See* AR 722.)

13   Similarly, Dr. Burt made inconsistent statements regarding Plaintiff's ability to ambulate that

14   ultimately affect the credibility of his medical opinion.  An ALJ may decide to give the examining

15   physicians' opinions less weight due to these issues.  And the record also contains reports from

16   reviewing physician Dr. Bianchi, who concluded that Plaintiff required far less serious limitations.

17        Plaintiff argues that because the ALJ made a legal error in rejecting the examining

18   physicians' opinions, the Court should credit as true their opinions—namely, that Plaintiff could

19   not work an eight-hour work day.  If these opinions were credited as true, Plaintiff urges, the ALJ

20   would have been required to find him disabled, so the Court should remand for an award of

21   benefits.  (Dkt. No. 20 at 12.)  The Ninth Circuit rejected the same argument in *Dominguez*, noting

22   that "this reverses the required order of analysis" because the court must "assess whether there are

23   outstanding issues requiring resolution *before* considering whether" to credit as true the

24   disregarding testimony or opinion evidence.  *Dominguez*, 808 F.3d at 409 (quoting *Treichler*, 775

25   F.3d at 1105).  Where, as here, "such outstanding issues do exist, the district court cannot deem

26   the erroneously disregarded testimony to be true; rather, the court must remand for further

27   proceedings."  *Id.* (citation omitted).

28        In short, because further administrative proceedings could address the inconsistencies,

1  conflicts, and potential gaps in the record, the Court does not proceed to the next question of

2  whether the ALJ would be required to find Plaintiff disabled if the treating physicians' opinions

3  were credited as true.  *See Dominguez*, 808 F.3d at 410 (citations omitted).  The Court will

4  therefore remand this case to the ALJ for further proceedings rather than payment of benefits.

## CONCLUSION

6       For the reasons described above, the ALJ erred in failing to provide specific, legitimate

7  reasons for discounting the opinions of examining physicians Drs. Charp and Burt and instead

8  giving the most credence to the conflicting opinion of Dr. Bianchi, the reviewing consultant.

9       Accordingly, the Court GRANTS IN PART Plaintiff's Motion for Summary Judgment

10  (Dkt. No. 20) and DENIES Defendant's Cross-Motion for Summary Judgment (Dkt. No. 25).  The

11  Court VACATES the ALJ's final decision and REMANDS for reconsideration consistent with

12  this Order.

13       This Order disposes of Docket Nos. 20 and 25.

14       **IT IS SO ORDERED.**

16  Dated:  February 29, 2016

                                              _____
                                              JACQUELINE SCOTT CORLEY
                                              United States Magistrate Judge

United States District Court
Northern District of California

42